PUMMILL v. HANCOCK EXPLORATION LLC



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:PUMMILL v. HANCOCK EXPLORATION LLC

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 PUMMILL v. HANCOCK EXPLORATION LLC
2018 OK CIV APP 48
419 P.3d 1268
Case Number: 114703
Decided: 01/05/2018
Mandate Issued: 06/20/2018
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2018 OK CIV APP 48, 419 P.3d 1268

 

CHARLES PUMMILL; MARK PARRISH; and CHRIS PARRISH, JR., Plaintiffs/Appellees,
v.
HANCOCK EXPLORATION LLC; YALE OIL ASSOCIATION, INC.; CHEVRON U.S.A., INC.; CIMAREX ENERGY CO.; and CIMAREX ENERGY CO. OF COLORADO, Defendants/Appellants.

APPEAL FROM THE DISTRICT COURT OF
GRADY COUNTY, OKLAHOMA

HONORABLE RICHARD G. VAN DYCK, TRIAL JUDGE

AFFIRMED

Robert N. Barnes, Patranell Britten Lewis, BARNES & LEWIS, L.L.P, Oklahoma City, Oklahoma
Kerry Caywood, Angela Caywood Jones, PARK, NELSON, CAYWOOD, JONES, L.L.P., Chickasha, Oklahoma and
Bradley E. Beckworth, Jeffrey J. Angelovich, Susan Whatley, NIX, PATTERSON & ROACH, L.L.P., Daingerfield, Texas, for Plaintiffs/Appellees

Richard B. Noulles, Bradley W. Welsh, GABLEGOTWALS, Tulsa, Oklahoma
Jeromy E. Brown, McCALLA BROWN PATEL, LLP, Chickasha, Oklahoma and
Nathan K. Davis, SNELL & WILMER, L.L.P., Denver, Colorado, for Defendants/Appellants

J. Kevin Hayes, Pamela S. Anderson, Dawson A. Brotemarkle, HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C., Tulsa, Oklahoma and
Craig Rainey, GPA MIDSTREAM ASSOCIATION, Tulsa, Oklahoma, for Amicus Curiae GPA Midstream Association

John J. Griffin, Jr., L. Mark Walker, Harvey D. Ellis, CROWE & DUNLEVY, A PROFESSIONAL CORPORATION, Oklahoma City, Oklahoma, for Amicus Curiae Oklahoma Independent Petroleum Association

Mark D. Christiansen, McAFEE & TAFT, Oklahoma City, Oklahoma, for Amicus Curiae Oklahoma Oil & Gas Association

Rex A. Sharp, REX A. SHARP, P.A., Prairie Village, KS for Amicus Curiae Tony R. Whisenant

Terry L. Stowers, Douglas E. Burns, BURNS & STOWERS, P.C., Norman, Oklahoma, for Amicus Curiae Coalition of Oklahoma Surface and Mineral Owners

P. THOMAS THORNBRUGH, VICE-CHIEF JUDGE:

¶1 Defendants, Hancock Exploration LLC; Yale Oil Association, Inc., Chevron U.S.A., Inc., Cimarex Energy Co., and Cimarex Energy Co. of Colorado, appeal from the district court's entry of a declaratory judgment, following a bench trial on remand, in favor of Plaintiffs, Charles Pummill, Mark Parrish, and Chris Parrish, Jr. The trial court rejected Defendants' claim that they were allowed to proportionately charge certain expenses against Plaintiffs' royalty payments.

¶2 The question of consequence on appeal involves Defendants' challenge to the trial court's determination of when the natural gas at issue here became a "marketable product." Finding that the trial court's decision of this fact-intensive issue is supported by competent evidence and is in accord with law, we affirm.

BACKGROUND

¶3 This is the second time this matter has been before the Court of Civil Appeals. In the first appeal, Case No. 111,096, the Supreme Court vacated an opinion by COCA's Division I, and affirmed in part and reversed in part the trial court's summary judgment in Plaintiffs' favor. After finding that disputed fact issues remained undetermined, the Court remanded the case for trial. See Pummill v. Hancock Exploration LLC, 2014 OK 97, 341 P.3d 69 (corrected order) ("Pummill I").

¶4 The record reflects that Plaintiffs, Charles Pummill, Chris Parrish, Jr., and Mark Parrish (collectively, Lessors or Plaintiffs), are descendants of the original mineral interest owners/lessors of two oil and gas leases on 160 acres in the SE/4 of Section 32, Township 9 North, Range 8 West, in Grady County (the property). The property now is part of a 640-acre, drilling and spacing unit from which the Parrish-Novotny No. 1-32 Well (the 1-32 well), has produced natural gas since 1985. Plaintiffs' interests derive from leases entered into in 1966 between the original lessors, Ethel Marie Pummill and Mabel Lee Parrish, and Jules Bloch. The women each retained royalty interests in production. The Parrish lease contains a "gross proceeds" royalty clause, while the Pummill lease contains a "market price at the well" clause.[1] Neither party to this litigation contends the language difference in the royalty clauses makes a difference when determining the point at which gas produced under the leases is a "marketable product."

¶5 The original lessee, Jules Bloch, assigned leasehold interests that ultimately were acquired by Defendants Hancock, Yale, and Chevron, as well as by Bloch's own company, Bloch Petroleum, LLC, which originally was named as a defendant in this case.[2] Each of these companies is a current lessee and a non-operating working interest owner in the 1-32 well.

¶6 Defendant Cimarex Energy Co. of Colorado has been the operator of the 1-32 well since 1999.[3] Cimarex Colorado is a wholly owned subsidiary of Defendant Cimarex Energy Co. (collectively, Cimarex). Cimarex does not own an interest in the 1-32 well, but other wholly-owned subsidiaries of Cimarex Energy own net revenue interests totaling approximately 40%. Since June 2005, Cimarex has marketed production from the 1-32 well and also has calculated and distributed royalty payments to royalty owners, including Plaintiffs.

¶7 Plaintiffs filed this action in October 2011, claiming Defendants had improperly interpreted the leases so as to negate the implied covenant to market gas. They claimed Defendants had refused to bear all of the costs necessary to create a marketable product, and had underpaid Plaintiffs by improperly charging certain expenses against Plaintiffs' royalty interests.

¶8 Defendants denied Plaintiffs' claims and asserted various affirmative defenses. Cimarex also counterclaimed, disputing Plaintiffs' interpretation of "marketability" and arguing that if the court found the lease provisions did not negate an implied covenant to market, then it should enter judgment declaring that gas from the 1-32 is "marketable at the custody transfer meter" located near the well. The custody transfer meter connects to a pipeline/gathering system owned by a group of entities collectively referred to by the parties as "Enogex/Enable" or "Enogex."[4] At all times relevant here, Enogex/Enable has gathered and transported the 1-32 gas to its off-lease processing plants, where it extracts natural gas liquids (NGLs) and delivers residue gas for sale into high pressure intra- or interstate pipelines. Cimarex specifically requested a declaration that it could proportionately charge Plaintiffs for processing costs incurred at the Enogex/Enable plants, as well as a determination that it could charge "any costs incurred for gas production" from the 1-32 well as long as "the other requisites for charging such costs to royalty owners" have been met under Mittelsteadt v. Santa Fe Minerals, Inc., 1998 OK 7, 954 P.2d 1203.[5]

¶9 Plaintiffs moved for summary judgment. As described in Pummill I, the trial court granted Plaintiffs' request and entered a lengthy judgment declaring that (1) neither the "gross proceeds" nor "market price at the well" lease language abrogated the "implied covenant to market" inherent in each lease, and, consequently, gas royalty payments under each lease were "free of all costs to create a marketable product"; (2) Defendants' use of a "percentage of proceeds" (POP) or "percent of index" (POI) form of gas purchase contract or service agreement with third parties instead of a "cash fee gathering agreement," did not change the amount of royalty owed under the leases; and (3) Defendants owed Plaintiffs royalty on gas from the 1-32 well "used off the lease or in the manufacture of products at the gas plant per the terms of the leases." A fourth issue, concerning interest owed by Defendants, was not disputed, and also was included in the court's judgment.

¶10 Defendants appealed. In June 2014, COCA Division I, finding the trial court's order adequately explained its decision, unanimously affirmed pursuant to Okla.Sup.Ct.R. 1.202(d). See Case No. 111,096 (opinion issued June 27, 2014). Defendants sought certiorari, which the Supreme Court granted. It thereafter vacated COCA's opinion, affirmed the trial court's judgment as to statutory interest, reversed its judgment as to the three other issues, and remanded, stating:

The appellants [Defendants] identified four issues in their appeal of the judgment of the district court: Issue 1. The express language of their leases does not abrogate or negate the implied covenant to market in any way; Issue 2. The current or future use of a POP, POI or any other form of contract, instead of a fee based agreement with Enogex, does not change the amount of royalties due under the leases; Issue 3. Appellants are entitled to receive royalties on gas used off the lease or in the manufacture of products at the gas plant; and Issue 4. Appellants owe interest on royalties not timely paid without prior demand from the royalty owners.

The briefs filed and the oral argument held before this Court on November 5, 2014, reveal that facts which could affect the resolution of the district court Issues I through III need to be addressed before the fact-finder, the district court. The parties at the oral argument affirmed that Issue IV was not contested.

Accordingly, certiorari is granted. The opinion of the Court of Civil Appeals is vacated. The judgment of the district court is affirmed in part and reversed in part and remanded with instructions to hear and decide the disputed fact issues.

Pummill I, 2014 OK 97, 341 P.3d 69 (corrected order).

¶11 On remand, the parties submitted to the trial court a "Stipulation of Undisputed Facts" (Stipulation), 49 joint exhibits, and numerous other exhibits and evidence. Both sides submitted proposed findings of fact and conclusions of law. Trial occurred in October 2015, at which time the court heard testimony from the parties, expert witnesses, and representatives of "non-party midstream companies" testifying on behalf of Defendants.

¶12 The trial court found in favor of Plaintiffs on their claims and against the Cimarex entities on their counterclaim. It entered a 74-page, multiple-part judgment explaining its decision and incorporating almost verbatim Plaintiffs' proposed findings of fact and conclusions of law. Relying heavily on Oklahoma Supreme Court case law, particularly Mittelstaedt and Wood v. TXO Production Corp., 1992 OK 100, 854 P.2d 880, the court held, inter alia, that:

¶13 -- None of the language in either lease abrogated the "implied covenant to market" long recognized in Oklahoma, particularly because neither lease describes any costs that may be charged against the lessor's royalty. Because each lease had an implied covenant to market, all gas royalty payments under each lease were "free of costs [required] to create a marketable product," regardless of "whether such costs are incurred on or off the lease." The court noted that, to the extent certain costs - such as those associated with compression, gathering, dehydration and processing - are needed to create a marketable product, if a lessee wants to deduct such costs from a lessor's royalty, it must say so directly in the lease. The court pointed to evidence of other leases entered into by lessees and/or Cimarex "spell[ing] out" that royalty owners are to share in such costs. Order at ¶ 16.

¶14 -- Regardless of Defendants' "past, current or future" use of a POP or POI form of contract with a gas gatherer or purchaser, such contracts did not and would not change the amount of royalty due under the leases, as long as the POP and POI contracts involve performing the same services necessary to render the gas capable of being sold on the commercial market.[6]

¶15 -- Defendants owed Plaintiffs royalty on gas from the 1-32 well that was used off the lease by Defendants or Enogex/Enable in gas gathering systems, gas plants, and transmission pipelines. The court looked to the "express terms of the Plaintiffs' leases" in reaching this conclusion. It also noted that, since at least 2002, Cimarex's corporate policy was to pay royalty on gas consumed by Enogex/Enable in its gathering system and compressors located off the lease. The court rejected Defendants' claim that they were entitled to deduct in-kind fuel fees resulting from Enogex/Enable's consumption, off the lease, of gas from the well as fuel to run its gathering system (e.g., compressors and other equipment) and gas plants.

 

¶16 -- Cimarex failed to sustain its burden of proof on its counterclaim. The court rejected Defendants' contention that gas from the 1-32 is a "marketable product," for purposes of calculating royalty payments, at the custody transfer meter located near the wellhead. The Court, in its core analysis, found that production was not complete until gas from the 1-32 was "delivered to the place of sale in marketable form," and that the evidence showed that this condition did not occur, in this case, until the gas was subjected to various additional field processes by Enogex/Enable.[7] The court cited Defendants' witnesses' testimony that "'field services' include gathering, compression, dehydration and processing," as well as industry publications describing the function of midstream companies as one of transforming gas into a marketable product and suggesting that gas does not become marketable until it is capable of being sold in the commercial interstate market. The court also held, however, that it was "not ruling . . . that gas can never be marketable at the well," and described a situation where gas from a well was capable of entering a high-pressure gathering pipeline at the wellhead or at a lease transfer meter.

¶17 -- Finally, the court held that even if it agreed with Defendants' marketability argument, Defendants had not presented evidence of all the elements required by Middlestaedt to show that the costs in question could be proportionately charged against royalties. It found, therefore, that Defendants could not deduct from Plaintiffs' royalty payments "any costs incurred . . . for gathering, compression, dehydration, and processing of the gas," and that Defendants failed to meet their burden of proving that "the processing fees (or any other fees charged by the midstream company Enogex/Enable to Cimarex for field services performed prior to the tailgate of its gas processing plants) were reasonable, enhanced the value of an already marketable product and increased royalty in proportion to the fee charged."

¶18 Defendants brought this appeal. In addition to the parties' briefs, we are aided by amici curiae briefs filed by individuals or associations with the approval of the Supreme Court on behalf of both sides to this litigation.[8]

STANDARD OF REVIEW

¶19 Pursuant to 12 O.S.2011 § 1654, declaratory judgments are "reviewable in the same manner as other judgments." Okla. City Zoological Tr. v. State ex rel. Pub. Emp. Relations Bd., 2007 OK 21, ¶ 5, 158 P.3d 461; Lockett v. Evans, 2014 OK 34, ¶ 3, 330 P.3d 488. "A suit for declaratory judgment pursuant to § 1651 is neither strictly legal nor equitable, but assumes the nature of the controversy at issue." Macy v. Okla. City School Dist. No. 89, 1998 OK 58, ¶ 11, 961 P.2d 804; see also Carpenter v. Carpenter, 1982 OK 38, ¶ 17, 645 P.2d 476 (whether declaratory judgment is legal or equitable depends on "essential nature" of case). Thus, determining the proper standard of review in a declaratory judgment action requires that we evaluate the nature of the case generally, considering the relief sought, the pleadings filed, and the parties' rights and remedies. See Wickham v. Simpler, 1946 OK 357, ¶ 13, 180 P.2d 171.

¶20 Here, the primary relief sought by Plaintiffs, and ultimately, by Defendants, concerned their competing views of the point at which gas production from the well became a "marketable product" for purposes of calculating royalties due under the Pummill and Parrish leases. Defendants asserted defenses that included a five-year statute of limitations, and both parties referred to the matter as a contract dispute. The Supreme Court has recognized that oil and gas leases are "contracts," and has characterized an oil and gas producer's liability under a lease as "purely contractual" in nature. See, e.g., Howell v. Texaco, Inc., 2004 OK 92, ¶¶ 25-26, 112 P.3d 1154 (citing Bunger v. Rogers, 1941 OK 117, ¶ 5, 112 P.2d 361, and Finley v. Marathon Oil Co., 75 F.3d 1225, 1229-30 (7th Cir. 1996)).

¶21 We find the action before us is a contract dispute, with neither party seeking relief in the form of an injunction, accounting, termination or cancellation of the leases, or other equitable relief. An action on a contract generally is treated as an action at law, with disputed fact questions submitted to a jury - or to the court when the matter is set for bench trial - for decision. See, e.g., Antrim Lumber Co. v. Bowline, 1969 OK 161, ¶ 28, 460 P.2d 914. The following passage from K&H Well Service, Inc. v. Tcina, Inc., 2002 OK 62, ¶ 9, 51 P.3d 1219, applies here:

The judgment presented for review is a compilation of both findings of facts and conclusions of law. When, as here, the case is tried to the court, its determination of facts [is] accorded the same force as those made by a well-instructed jury. If any competent evidence supports the trial court's findings of fact, the same will be affirmed.

Id., ¶ 9 (emphasis added, footnotes omitted); see also Soldan v. Stone Video, 1999 OK 66, ¶ 6, 988 P.2d 1268; and Baer, Timberlake, Coulson & Cates, P.C., v. Warren, 2010 OK CIV APP 112, ¶ 2, 241 P.3d 1155. We further note that there is a "presumption of correctness" afforded to a trial court's findings of fact, even if those findings were adopted by the court from written findings prepared by counsel with minimal changes. Golsen v. ONG Western, Inc., 1988 OK 26, ¶ 5, 756 P.2d 1209.

¶22 Thus, presuming that the implied covenant to market has not been expressly negated as a matter of law (an issue that Defendants do not argue on appeal), the question of whether Defendants have fulfilled their duty under that covenant - including the question of whether they have underpaid royalties - presents an issue of fact.[9] This Court will not disturb the trial court's factual findings if they are supported by any competent evidence, including reasonable inferences derived from that evidence.

¶23 To the extent that issues of law are presented, however, they are reviewed de novo, since an appellate court has plenary, independent and non-deferential authority to reexamine a trial court's legal rulings. K & H Well Serv., 2002 OK 62 at ¶ 9. Issues of law include matters such as statutory construction, and the interpretation of ambiguous contract provisions "'where the ambiguity can be cleared by reference to other provisions or where the ambiguity arises from the contract language and not from extrinsic facts.'" Scungio v. Scungio, 2012 OK 90, ¶ 9, 291 P.3d 616 (quoting Okla. Oncology & Hematology, P.C. v. U.S. Oncology, Inc., 2007 OK 12, ¶ 27, 160 P.3d 936). Here, the parties have stipulated to certain facts, and to the extent that conflicting inferences reasonably cannot be drawn from those facts, our review is de novo. See, e.g., Rist v. Westhoma Oil Co., 1963 OK 126, 385 P.2d 791 (syllabus 4).

ANALYSIS

¶24 Defendants' primary contention on appeal is that the trial court committed reversible error in finding - as a matter of fact - that gas produced from the 1-32 well is not a "marketable product" at the custody transfer meter or any other point prior to the Enogex/Enable plant tailgate. Defendants also claim error in the court's other determinations of fact. Because those other determinations depend on resolution of the "marketable product" question, we address the latter issue first.

Competent Evidence Supports the Trial Court's "Marketable Product" Finding

¶25 The issue of when natural gas first becomes "marketable" has been the source of much contention and consternation in both legal and oil and gas circles for several years. One writer has noted:

A majority of states and the federal government require the lessee to bear all or most of the cost of making oil and gas marketable. One rationale is that there really isn't "production" - and all states require the lessee to bear the costs of production - until there is a marketable product. Another is that when the lessee bears the implied duty to market, it must pay all related costs as it does with the other implied duties. The most influential author on implied covenants, Maurice Merrill, phrased this rationale as follows:

If it is the lessee's obligation to market the product, it seems necessarily to follow that his is the task also to prepare it for market, if it is unmerchantable in its natural form. No part of the costs of marketing of or preparation for sale is chargeable to the lessor.

With some significant variations . . . the leading decisions requiring lessees to bear marketing costs are in Colorado, Kansas, Oklahoma, and West Virginia; . . . In states that take this approach, the term "at the well" is not viewed as sufficiently specific to authorize deduction of costs incurred after the wellhead. The term (which after all does not specifically say anything about costs) is treated as silent on deductions or as ambiguous, with ambiguities generally construed against the lessee.

. . .

In marketable-product states, courts continue to see fervent battles over where gas becomes marketable, with costs incurred after that point deductible. In general, courts in these states have resisted letting isolated wellhead sales determine marketable value in today's deregulated natural gas market, in which active markets generally are found not at or near the well but instead at the outlet of processing plants or the inlet of the mainline pipelines located far downstream. Logically, marketability should be linked to the duty to get the best price reasonably possible, a price that in modern gas markets is almost always found at an after-the-processing-plant location.

McArthur, J.B., "U.S. Oil and Gas Implied Covenants and their Functions . . .," 61 RMMLF-INST 29-1, § 29.03[4][c](2015) (footnotes omitted).

¶26 Oklahoma law is clear that a lessee has an implied duty to obtain a "marketable product," including the cost of preparing the gas for market and getting the gas to the place of sale in marketable form. Wood, 1992 OK 100 at ¶¶ 9-12. As a general rule, the lessee may not deduct from royalty payments the costs of gathering, transportation, compression, dehydration, or blending if those costs are required to create a marketable product, unless the lease provides otherwise. See Mittelstaedt, 1994 OK 7 at ¶¶ 20-22; Wood, 1992 OK 100 at ¶¶ 9-11; TXO Prod. Corp. v. State ex rel. Comm'nrs of the Land Office, 1994 OK 131, ¶¶ 11-17, 903 P.2d 259 ("CLO"). The duty to market further includes the obligation to obtain the best price available.[10] Howell v. Texaco, Inc., 2004 OK 92, ¶ 22, 112 P.3d 1154.

¶27 The lessee's obligation is not unlimited. In Mittelstaedt, where the Court considered a "gross proceeds" lease, the Court recognized that, although expenses to obtain marketable production are not chargeable against royalty, reasonable "post-production expenses" might be applied against the royalty if the expenses involve "enhancing the value" of an already marketable product, and the lessee shows that the expenditures resulted in a proportionate increase in royalty revenue. The Court stated:

[T]his clause [i.e., the "gross proceeds" clause], when considered by itself, prohibits a lessee from deducting a proportionate share of transportation, compression, dehydration, and blending costs when such costs are associated with creating a marketable product. However, we conclude that the lessor must bear a proportionate share of such costs if the lessee can show (1) that the costs enhanced the value of an already marketable product, (2) that such costs are reasonable, and (3) that actual royalty revenues increased in proportion with the costs assessed against the nonworking interest. Thus, in some cases a royalty interest may be burdened with post-production costs, and in other cases it may not.

1998 OK 7 at ¶ 2 (emphasis added).

¶28 Mittelstaedt made clear that a lessee has the burden of proving the elements required to charge post-production expenses against royalty owners' interests, including that a marketable product exists. Unfortunately, the Court did not define the meaning of "marketable product," nor has it done so since.[11]

¶29 Defendants argue the trial court's finding that the 1-32 gas was not marketable at or near the wellhead was an abuse of discretion and unsupported by the evidence. They urge this Court to adopt a definition of "marketable" identical to that of the Supreme Court of Kansas in Fawcett v. Oil Producers, Inc., of Kansas, 352 P.3d 1032, 1034 (Kan. 2015)(court syllabus), that "production is merchantable once the operator has put it into a condition acceptable to a purchaser in a good faith transaction." Defendants contend their evidence of industry custom and practice, of the quality of the 1-32 gas at the custody meter, and of the existence of hypothetical buyers for gas at the wellhead, supports only their view, i.e., that the gas is a "marketable product" at either or both of those points.

 

¶30 We recognize that Defendants presented evidence conflicting with Plaintiffs' evidence on these issues. We disagree, however, with Defendants' conclusion that Plaintiffs' evidence does not support the trial court's judgment.

¶31 It is undisputed that raw gas from the 1-32 is both low in pressure and saturated with water vapor, and that it must be compressed and dehydrated even to be accepted into the Enogex/Enable pipeline near the well. It is also undisputed that the 1-32 gas must undergo further field services and processes - including multiple additional stages of compression and dehydration, and extraction of NGLs - before residue gas is acceptable for delivery, at the tailgates of Enogex/Enable's gas plants,[12] to the high-pressure, Enable Oklahoma Intrastate Transmission (EOIT) pipeline or to one of four high-pressure interstate pipelines,[13] and for sale to downstream purchasers in industrial, consumer, and other markets.

¶32 There are no high-pressure lines at the 1-32 well. While Defendants produced evidence that there is, theoretically, a "market" for wellhead gas to a limited group of potential purchasers - "midstream" companies who might purchase raw or minimally processed gas, likely under a POP or POI contract for further processing and sale downstream - Defendants produced no evidence that in actual practice Cimarex makes any sales until the gas reaches the EOIT or one of the four interstate pipelines.

¶33 Cimarex pays royalty based on the price it receives for the latter sales, less certain deductions it charges against royalty payments as detailed in the Stipulations.[14] These charges have varied over the years that Cimarex has operated the 1-32, depending on service or sale contracts applicable to the well, or according to Cimarex corporate policy. Under Cimarex's current service agreement with Enogex, Enogex performs additional field services although title to the gas is retained by Cimarex, as operator, until it is sold.

¶34 Plaintiffs admit that after the residue gas leaves the tailgates of the Enogex/Enable gas plants, the gas is a marketable product. The parties' Joint Stipulation details the several times since 2002 that Cimarex has changed the amount and method of calculating royalties, both in terms of the specific expenses it has proportionately charged against royalty owners' payments and the point at which it began taking those deductions. Cimarex also has periodically issued refunds of withheld payments.

¶35 Since February 2012, Cimarex has deducted from Plaintiffs' royalty payment a proportionate share of the in-kind transportation fuel gas charge incurred for transporting residue gas on the EOIT pipeline. Since April 2013, pursuant to company policy, Cimarex also has deducted the proportionate cost of a cash transportation fee incurred on the EOIT pipeline. However, Cimarex and the other working interest owners have alone borne the cash gathering fee, cash compression fee, and in-kind fuel fees for gas used off the lease but in the gathering system and compressor located upstream of the Enogex gas plants. At all times except February to December 2012, Enogex has retained the value of all extracted NGLs and Cimarex has not paid royalties based on that value.[15]

¶36 Defendants' witnesses testified that from 1966 through 1985, most gas production in Oklahoma was sold "at the well" to a federally regulated intra- or interstate pipeline company and lessees would pay royalties on proceeds at that location. However, it is undisputed that Cimarex is not in the wellhead market and therefore makes no actual sales of 1-32 gas at the well to any purchaser.

¶37 Plaintiffs' evidence as to industry custom and practice during the 1960s to 1980s was that the practices described by Defendants' witnesses were not the case in central Oklahoma, where the 1-32 is located. Plaintiffs' expert testified that in central Oklahoma during that time, producers, rather than interstate pipelines, owned gathering systems and gas plants, and sales were made away from the wellhead, so that "once again, marketable product [was] at the tailgate" of a gas processing plant. Plaintiffs also introduced multiple exhibits and statements in industry corporate publications referring to the work of midstream service providers as delivering the processing services needed to render gas "marketable" or put it in a "marketable condition." Such exhibits included at least one joint exhibit, JX 48, a flyer from an Enogex affiliate, stating in part:

The quality of natural gas varies and can present problems to gas pipelines distributors, appliance manufacturers and consumers. Because some natural gas must be processed before it meets quality specifications and can be used as fuel, Enogex Products LLC provides processing services to the natural gas industry to ensure that the gas is marketable and safe for delivery to and use by consumers.

¶38 The trial court's decision focused on the undisputed evidence that the market in which Defendants have chosen to participate, and the first, actual sale of gas from the 1-32, does not in fact occur until after the gas is further compressed, treated, dehydrated, separated, and processed so that it is acceptable for transport in high-pressure pipelines. The court also focused on the fact that Cimarex claimed it was at this point that the operator could obtain the best price for the gas - i.e., at the "tailgate" of the plants, where gas is transferred into high-pressure lines. Cimarex admitted that it has a duty to obtain the highest and best price for the gas.

¶39 As we noted above, the trial court further found it significant that - even assuming arguendo that the gas is a marketable product at the wellhead - Defendants provided no evidence that actual royalty revenues would increase in proportion with the costs assessed against non-working interests, i.e., the costs that Defendants claimed were needed to "enhance the value" of an already marketable product. In addition, the court noted that Defendants' former co-defendant, Bloch Petroleum, had admitted it agreed with Plaintiffs' position. Although Defendants argue Bloch's position resulted from "coercion" by Plaintiffs in settling with Bloch, this factor nonetheless was evidence that the trial court was entitled to weigh and consider.

¶40 After reviewing the record and the parties' briefs, we find competent evidence supports the trial court's decision that gas from the 1-32 is not an "already marketable product" as required by Mittelstaedt at either the wellhead or the custody transfer meter. Despite Defendants' evidence that the gas might have been acceptable for sale to a limited group of buyers at the wellhead, such sales were undisputedly purely hypothetical. Evidence of hypothetical sales of raw product to a limited group of potential purchasers to whom such gas would be acceptable, does not readily lend itself to a conclusion that the product being sold is "marketable" in a free and competitive market. And again, this was an aspect of the evidence that the trial court was entitled to take into account in resolving the factual question of marketability. A finding that gas from the 1-32 is not marketable until it reaches the tailgate of the Enogex plants is more consistent with the Supreme Court's description of "market value" in Howell v. Texaco, as being based on what a product will sell for, between a willing buyer and seller, in "a free and open market." 2004 OK 92 at ¶ 17.

¶41 We further agree with the trial court that Defendants failed to sustain their burden of proving they are entitled to deduct proportionate post-production costs from royalty owner shares under Mittelstaedt. Reading Mittelstaedt in conjunction with other Supreme Court decisions on the same subject reveals that the Court has never been as interested in drawing a hard line on when gas is "marketable" as it has been in assuring that royalty is paid according to the terms of the lease, and that royalty owners are not deprived of the best deal that a producer can make.

¶42 The duty to create a marketable product is a corollary to the implied duty to market. The duty involves not only bringing the gas to market but also obtaining the best price reasonably possible. The key point of Mittelstaedt, in many ways, was its requirement that a lessee must demonstrate to a questioning royalty owner that the terms of a lease are being fulfilled. That demonstration cannot be made without showing that the other elements of Mittelstaedt have been met. In this case, Defendants' briefs do not direct us to evidence showing that "actual royalty revenues increased in proportion with the costs assessed against the nonworking interest," nor do they even argue that point.

¶43 Defendants argue nonetheless that we should adopt the Kansas Supreme Court's holding in Fawcett, where the Court "declined to equate 'marketable condition' with the specifications of a downstream mainline transmission line." The Court in Fawcett made clear that it was rejecting the royalty owners' request that the Court adopt the latter definition "as a matter of law or fact," 352 P.3d at 1039, and specifically held:

We hold that when a lease provides for royalties based on a share of proceeds from the sale of gas at the well, and the gas is sold at the well, the operator's duty to bear the expense of making the gas marketable does not, as a matter of law, extend beyond that geographical point to post-sale expenses. In other words, the duty to make gas marketable is satisfied when the operator delivers the gas to the purchaser in a condition acceptable to the purchaser in a good faith transaction. . . .

Id. at 1042. The Court reversed summary judgment in favor of the royalty owners. It held the operator fulfilled its "duty to market" with its sale of gas "at the wellhead" in arms' length, good faith transactions to third parties who in turn processed the gas before it entered the interstate pipeline system.[16] The Court noted that it was "sensitive to the potential for claims of mischief given an operator's unilateral control over production and marketing decisions," but further noted the operator's good faith and prudence had not been questioned in the case. Id.

¶44 Fawcett has limited application here, for at least three reasons. First and most obviously, we are bound to follow Oklahoma precedent. As the trial court here recognized, Mittelstaedt and Wood clearly apply to this matter. Secondly, we do not find language in Fawcett suggesting that the Kansas Court intended to overturn the existing rule that a lessee-operator has the duty to make gas marketable and that it must do so free of cost for field services to royalty owners. See 352 P.3d at 1033 (syllabus by the Court). Finally, Fawcett is factually distinguishable in that the first, actual sales of gas occurred at the wellhead, and the lease language clearly made reference to royalties measured by sales "at the mouth of the well" or "if sold at the well" in contrast to the "gross proceeds" language at issue here. That said, however, we believe that even if we used the definition of "marketable production" used in Fawcett, we would reach the same result under the circumstances presented in this case, pursuant to our standard of review of whether the trial court's decision here is supported by competent evidence. We have found that such is the case, and for this reason the trial court's decision on the marketability question must be affirmed.

The Trial Court's Decisions Concerning POP and PIP Contracts and Fuel Gas as Subject to Royalty

¶45 Defendants' complaints about the trial court's other holdings depend in large part on their success in having the trial court's marketable product decision overturned. The trial court held that Defendants' "past, current, or future" use of contract forms that incorporate the same services as their service agreement with Enogex/Enable will not change the amount of royalty due under the Plaintiffs' leases. We find this decision is legally sound under the facts presented, and as long as the basic facts remain unchanged - i.e., that the first, arms' length sale of 1-32 gas by Defendants does not occur until the processed gas reaches the tailgates of the Enogex/Enable gas plants, and Defendants remain unable to demonstrate the other elements required by Mittelstaedt. Although neither this Court nor the trial court can give an advisory opinion as to the consequences of Defendants' future conduct in operating and managing gas transactions regarding the well, we find no error in the trial court's declaration that, in essence, states Defendants may not employ POP and PIP contracts simply in order to avoid the court's decision concerning allocating costs as set forth in its order.

¶46 Similarly, Defendants' argument that they do not owe royalty on 1-32 gas used off the lease depends on their characterization of off-lease operations as "enhancing the value" of an already marketable product - a characterization that failed in the trial court. Defendants also do not address the trial court's holding that royalty is owed on this gas under the express terms of the Parrish and Pummill leases. We therefore find no error in the trial court's holding on this issue, as well.

Defendants' Claim Concerning the Effect of This Decision

¶47 In what appears to be a final grasp at unwarranted drama, in their last proposition of error Defendants accuse the trial court of wrongly imposing "an implied covenant that the lessee alone will bear 100% of the off-lease costs of gathering, compression, dehydration and processing." They contend that the court's failure to find in their favor on marketability will have wide-ranging, destructive ramifications for the oil and gas industry, and that the court essentially has made them, as oil and gas producers, 100% liable for all costs of production as concerns royalty payments. This description exaggerates the extent to which the issue presented here can be applied outside the limited realm of this case. It also ignores the requirements that Mittelstaedt places on lessees in Defendants' position, particularly in its failure to recognize that Defendants did not present evidence going to each of the elements of Mittelstaedt.

CONCLUSION

¶48 The trial court's decision that gas from the 1-32 well is not a marketable product at or near the wellhead is supported by competent evidence, and the court's determination that Defendants failed to sustain their burden of proof under Mittelstaedt is correct as a matter of law. Defendants may not deduct from Plaintiffs' royalties the proportionate expenses associated with preparing the gas for sale to an interstate pipeline downstream from the well. We find no error in the trial court's holding that POP and PIP contract forms may not be used to avoid Defendants' royalty obligations that the court found apply here, nor do we find error in its decision concerning royalties payable on 1-32 gas used in Defendants' or midstream service companies' operations off the Parrish and Pummill leases.

¶49 The trial court's judgment is therefore affirmed.

¶50 AFFIRMED.

GOODMAN, J. (sitting by designation), and FISCHER, J. (sitting by designation), concur.

 

FOOTNOTES

[1] The Parrish lease "gross proceeds" provision reads as follows:

2nd. To pay lessor for gas from each well where gas only is found, the equal one eighth (1/8) of the gross proceeds at the prevailing market rate, for all gas used off the premises . . . .

The Pummill lease "market price at the well" provision reads:

2nd. To pay lessor for gas of whatsoever nature or kind produced and sold or used off the premises, or used in the manufacture of any products therefrom, one eighth (1/8) of the market price at the well for the gas sold, used off the premises, or in the manufacture of products therefrom . . . .

Both leases contain the following provisions:

3rd. To pay lessor for gas produced from any oil well and used off the premises, or for the manufacture of casing-head gasoline or dry commercial gas, one-eighth (1/8) of the proceeds, at the mouth of the well, at the prevailing market rate for the gas during which time such gas shall be used . . . .

Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for its operations theron, except water from wells of lessor.

[2] According to the parties' Stipulation of Undisputed Facts, ¶¶ 62 through 68, a class action was filed against Bloch Petroleum in March 2011 after it was discovered (in late 2010) that the company had never paid royalties on gas sales from the 1-32 well. Bloch Petroleum did not oppose class certification, and ultimately paid class members 100% of past royalties due without deduction of any costs or expenses. Plaintiffs dismissed this action as to Bloch Petroleum after the company filed an answer disputing neither the "factual allegations" of Plaintiffs' petition as related to Bloch Petroleum, nor "the legal position asserted by Plaintiffs." Record, pp. 20 & 25. Defendants contend Bloch's concessions were made as part of the class action lawsuit settlement, and the parties agree that the concessions do not bind any other parties.

[3] Cimarex Colorado was known as Gruy Petroleum Management Co. from 1999 to 2005.

[4] Prior to 2013, the entities included Enogex, LLC, Enogex Gathering & Processing, and Enogex Gas Gathering, LLC. In 2013, Enogex Gas Gathering, LLC, changed its name to Enable Gas Gathering, LLC; Enogex Gathering and Processing changed to Enable Gathering & Processing, LLC; and Enogex, LLC, changed to Enable Oklahoma Intrastate Transmission, LLC. Also in 2013, Enable Midstream Partners, LP, was created to operate Enogex LLC and CenterPoint Energy, Inc. Stipulation of Undisputed Facts at ¶ 21.

[5] This contention further reflects Defendants' agreement that both leases should be interpreted in the same manner when determining the question of marketability, without regard to the differences in royalty clause language in each lease.

[6] POP and POI contracts are often used for sales of gas at the wellhead to midstream companies that further compress, dehydrate, treat, and process the gas, including separating out natural gas liquids (NGLs) and residue gas, in order to render the gas capable of being accepted into a high pressure, intra- or interstate pipeline in the commercial interstate market. See Amicus Brief of GPA Midstream Association; and Corrected Order at pp. 40-42.

[7] The court stated it found "compelling evidence that gas from the Parrish-Novotny 1-32 Well is not a marketable product until the field processes of gathering, compression, dehydration and processing have occurred at or before the tailgate of the [Enogex/Enable] gas plant[s]." Corrected Order at p. 67, ¶ 69.

[8] Amici curiae briefs supporting the position of Defendants/Appellants were filed by the Oklahoma Independent Petroleum Association, the Oklahoma Oil & Gas Association, and GPA Midstream Association. Amici curiae briefs filed in support of Plaintiffs/Appellees were by Tony R. Whisenant and the Coalition of Oklahoma Surface and Mineral Owners.

[9] The separate opinion in Mittelstaedt described Oklahoma case law as erroneously treating marketability as a question of law, see 1998 OK 7 at ¶ 15 (Opala, J., and Watt, J., dissenting in part); however, the majority in Mittelstaedt did not describe the issue as such nor did prior cases dealing with the issue. The majority opinion reviewed case law concerning the implied duty to market, noting that the issues involved in the cases required a fact-intensive analysis as to which costs are deductible and which are not. In this regard, see also Garman v. Conoco, Inc., 886 P.2d 652, n.28 (Colo. 1994)(cited with approval in Mittelstaedt, 1998 OK 7 at ¶¶ 15-16)(majority opinion), where the Court described the issue of whether a lessee has reasonably met its duty to market as one of fact.

[10] The duty to obtain the best price is frequently the object of cases in which an operator may have engaged in self-dealing or some similar situation where a conflict of interest is clear: "Today the industry is mired in natural gas cases over lessees who pay on values they claim should be set in wellhead sales, yet keep for themselves higher prices they reap when they make their first true sales of gas downstream beyond gas processing plants." McArthur, J.B., "U.S. Oil and Gas Implied Covenants and their Functions . . .," 61 RMMLF-INST 29-1, § 29.03[4](2015).

[11] Although of limited applicability here, in Howell v. Texaco, Inc., 2004 OK 92 at ¶¶ 17-20, the Court considered the question of market value of produced gas "at the wellhead" where the first arms-length sale of gas occurred after the gas was processed. The marketability of the gas "at the wellhead" was not at issue, and the defendants' claim that gas was marketable at the wellhead was not challenged by royalty owners. The Court noted the definition of "market value" as "the price negotiated by a willing buyer, not obligated to buy, and a willing seller, not obligated to sell, in a free and open market," id., ¶ 17, and described three ways to establish market value: (1) "first and most preferred," an "actual arms-length sale" at the wellhead for the best price available (an intra-company sale is not acceptable); (2) the "prevailing market price" method, determined through arms-length offers to purchase from the same well, close in time to the sale at issue; and (3) the "work-back method," in which market value "at the wellhead is calculated by subtracting allowable costs and expenses from the first downstream, arm's length sale" away from the well. Id., ¶¶ 18-20 (emphasis added). Because there were no actual, arm's length sales of gas at the well, the Court held the royalty owners were entitled to payments based on the higher of either the prevailing market price of the gas as sold, or the price obtained by using the "work back" method - a method which of necessity requires that gas at the wellhead is already "marketable" before the method may be employed, since it contemplates that only "allowable" costs may be deducted. See id. "Whenever a producer is paying royalty based on one price but it is selling the gas for a higher price, the royalty owners are entitled to have their payments calculated based on the higher price." Id., ¶ 22.

[12] The plants are located 20 to 33 miles away from the 1-32 well site.

[13] The interstate pipelines identified by the parties are ANR Pipeline, Enable Gas Transmission, LLC, Natural Gas Pipeline Co. of America LLC, and Panhandle Eastern Pipeline.

[14] According to the Joint Stipulation, at ¶ 59:

The gross value on which Cimarex pays Plaintiffs' royalty is based on the weighted average sales price (WASP), which is the average price that Cimarex receives for sales of residue gas to various customers at the Enogex West pool point located on EOIT downstream of Enogex/Enable's gas processing plants. At these points of sale the residue is at least 600 psi and is acceptable by EOIT and the 4 interstate pipelines connected to EOIT. . . . The WASP is based on sales beyond the gas plant tailgate. . . . In other words, Cimarex pays Plaintiffs royalty based on the sales price received by it, less the costs deducted under Cimarex' royalty policy, i.e., the cash transportation fee and transportation in-kind fuel gas charge for residue gas incurred by Cimarex beyond the gas plant tailgates under the Enogex Service Aagreement.

[15] From February to December 2012, Cimarex and Enogex had a Gas Processing Agreement under which Cimarex also sold the NGLs processed from the 1-32 stream, and Cimarex paid royalties on those sales.

[16] The leases in question required the operator to pay based on proceeds "from the sale of gas as such at the mouth of the well .: or "if sold at the well." 352 P.3d at 1039. Like the POP and PIP contracts discussed in this opinion, the price paid for the raw gas in Fawcett was based on a formula that started with the price the third parties were paid for processed gas; and royalties were also based on that price, with proportionate charges made against royalties for costs between the first sale and the second. The Court noted, "As such, if the question were whether those negotiated formulas produce an adequate price, the answer would seem to require a fact-based analysis to determine whether the operator entered into good faith sales and whether the terms of those sales were reasonable under the circumstances." Id.






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2010 OK CIV APP 112, 241 P.3d 1155, BAER, TIMBERLAKE, COULSON & CATES, P.C. v. WARREN
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1988 OK 26, 756 P.2d 1209, 59 OBJ 719, Golsen v. ONG Western, Inc.
Discussed
 1998 OK 7, 954 P.2d 1203, 69 OBJ 490, MITTELSTAEDT v. SANTA FE MINERALS, INC.
Discussed at Length
 1992 OK 100, 854 P.2d 880, 63 OBJ 2023, Wood v. TXO Production Corp.
Discussed at Length
 1994 OK 7, 867 P.2d 1272, 65 OBJ 300, Cleghorn v. Maples
Cited
 1994 OK 131, 903 P.2d 259, 65 OBJ 3972, TXO Production Corp. v. State ex rel. Com'rs of Land Office
Discussed
 1946 OK 357, 180 P.2d 171, 198 Okla. 580, WICKHAM v. SIMPLER
Discussed
 1963 OK 126, 385 P.2d 791, RIST v. WESTHOMA OIL COMPANY
Discussed
 2002 OK 62, 51 P.3d 1219, K & H WELL SERVICE, INC. v. TCINA, INC.
Discussed at Length
 1969 OK 161, 460 P.2d 914, ANTRIM LUMBER COMPANY v. BOWLINE
Discussed
 2004 OK 92, 112 P.3d 1154, HOWELL v. TEXACO, INC.
Discussed at Length
 2007 OK 12, 160 P.3d 936, OKLAHOMA ONCOLOGY & HEMATOLOGY P.C. v. US ONCOLOGY, INC.
Discussed
 2007 OK 21, 158 P.3d 461, OKLAHOMA CITY ZOOLOGICAL TRUST v. STATE ex rel. PUBLIC EMPLOYEES RELATIONS BD.
Discussed
 2012 OK 90, 291 P.3d 616, SCUNGIO v. SCUNGIO
Discussed
 2014 OK 34, 330 P.3d 488, LOCKETT v. EVANS
Discussed
 2014 OK 97, 341 P.3d 69, PUMMILL v. HANCOCK EXPLORATION LLC
Discussed at Length
 1982 OK 38, 645 P.2d 476, Carpenter v. Carpenter
Discussed
 1998 OK 58, 961 P.2d 804, 69 OBJ 2254, MACY v. OKLAHOMA CITY SCHOOL DIST. NO. 89
Discussed
 1999 OK 66, 988 P.2d 1268, 70 OBJ 2176, Soldan v. Stone Video
Discussed
 1941 OK 117, 112 P.2d 361, 188 Okla. 620, BUNGER v. ROGERS
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 1654, Determination to Have Effect of Final Judgment - Reviewable as Other Judgments
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA