**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 3, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

NAYLOR FARMS, INC.; HARREL'S
LLC,

     Plaintiffs - Appellees,

v.

CHAPARRAL ENERGY, LLC,

     Defendant – Appellant,

_____

BLACK STONE MINERALS
COMPANY, L.P.,

     Amicus Curiae.

No. 17-6146

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:11-CV-00634-HE)**
_____

Anthony J. Shaheen, Holland & Hart LLP, Denver, Colorado (Christopher A. Chrisman and Jessica M. Schmidt, Holland & Hart LLP, Denver, Colorado; Linda J. Byford, Chaparral Energy, LLC, Oklahoma City, Oklahoma; John J. Griffin, Jr., Harvey D. Ellis, Jr., and Charles V. Knutter, Crowe & Dunlevy, Oklahoma City, Oklahoma, with him on the briefs), for Defendant-Appellant Chaparral Energy, LLC.

Conner L. Helms (Gary R. Underwood and Erin M. Moore, with him on the brief), Helms Underwood & Cook, Oklahoma City, Oklahoma, for Plaintiffs-Appellees Naylor Farms, Inc. and Harrel's LLC.

Daniel H. Charest and Warren T. Burns, Burns Charest LLP, Dallas, Texas, filed an amicus curiae brief for Black Stone Minerals Company, L.P. in support of Plaintiffs-Appellees Naylor Farms, Inc. and Harrel's L.L.C.

_____

Before **MORITZ**, **MURPHY**, and **EID**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

Defendant Chaparral Energy, L.L.C. (Chaparral) operates approximately 2,500 oil and gas wells in Oklahoma. Plaintiffs Naylor Farms, Inc. and Harrel's, L.L.C. (collectively, Naylor Farms) have royalty interests in some of those wells. As a result, Naylor Farms receives a portion of the proceeds those wells generate. But according to Naylor Farms, Chaparral systematically underpaid Naylor Farms and other similarly situated royalty owners by improperly deducting from their royalty payments certain gas-treatment costs—costs that Naylor Farms says Chaparral was required to shoulder under Oklahoma law. Thus, Naylor Farms brought a putative class-action lawsuit against Chaparral and moved to certify the class under Rule 23 of the Federal Rules of Civil Procedure. The district court granted Naylor Farms' motion to certify, and Chaparral now appeals the district court's certification order. For the reasons discussed below, we affirm.

## Background

Under Oklahoma law, lessees like Chaparral are subject to an implied duty of marketability (IDM).[1] The IDM imposes upon lessees "a duty to provide a

_____

[1] The parties agree that Oklahoma substantive law controls.

2

marketable product available to market." *Mittelstaedt v. Santa Fe Minerals, Inc.*, 954 P.2d 1203, 1206 (Okla. 1998). Consistent with this duty, lessees are generally precluded from passing along to royalty owners any costs the lessees incur in making a product marketable. *See id.* at 1208. And because "raw or unprocessed gas" must typically "undergo[] certain field processes"—such as gathering, compressing, dehydrating, transporting, and producing (GCDTP services)—to make the gas marketable, lessees generally bear the costs associated with performing such services. *Id.* at 1205, 1208.

Citing the IDM, Naylor Farms brought a putative class-action lawsuit against Chaparral, asserting claims for breach of contract, breach of fiduciary duty, fraud, unjust enrichment, and failure to produce in paying quantities. As relevant here, Naylor Farms' complaint alleges that Chaparral breached the IDM by improperly deducting GCDTP-service costs from the royalty payments Chaparral made to Naylor Farms and to other similarly-situated royalty owners. More specifically, Naylor Farms contends that in an attempt to circumvent the IDM, Chaparral enters into wellhead sales contracts with midstream processing companies. Under the terms of those contracts, the midstream companies acquire title or possession of unprocessed gas at or near the wellhead.[2] Yet according to Naylor Farms, the midstream

---

[2] The contracts fall into two categories: percentage-of-proceeds (POP) contracts and percentage-of-liquids (POL) contracts. The vast majority of the contracts at issue are POP contracts. Under a POP contract, the midstream processing company takes possession of the entire gas stream, processes the gas, sells it to a downstream purchaser, and then pays Chaparral a percentage of the resulting proceeds. Under a POL contract, the midstream processing company obtains

3

companies don't actually pay Chaparral for the gas at this time. Instead, the midstream companies first perform certain GCDTP services and then sell the treated gas to downstream purchasers.

At that point, Naylor Farms asserts, the midstream companies (1) take the gross proceeds they receive from the downstream sales; (2) deduct from those gross proceeds the costs and fees associated with performing the GCDTP services;[3] and (3) pay Chaparral for the gas they previously acquired at the wellhead by giving Chaparral the resulting net proceeds. Chaparral then calculates royalty payments based on the net proceeds it receives from the midstream companies, rather than calculating royalty payments based on the gross proceeds the midstream companies receive from the downstream sales. And in doing so, Naylor Farms alleges, Chaparral impermissibly "requires royalty owners to bear the costs of transforming unprocessed gas into a marketable product," thus violating the IDM. *Id.* at 13.

Based on this theory of liability, Naylor Farms moved to certify a class comprising it and other similarly situated royalty owners.[4] In relevant part, Naylor

---

(1) possession of *and* title to the natural gas liquids (NGLs) and (2) possession of (but not title to) the residue gas at the wellhead. Chaparral retains title to the residue gas, which the midstream processing company returns to Chaparral after performing certain GCDTP services. The midstream processing company then charges Chaparral a fee for performing the GCDTP services and also retains the NGLs.

[3] Under a POL contract, the midstream processing company charges a fee and retains the NGLs.

[4] After Naylor Farms moved to certify, Chaparral filed for bankruptcy. The bankruptcy court initially imposed an automatic stay on the underlying proceedings. But it then partially lifted that stay so the district court could rule on Naylor Farms' motion to certify.

Farms argued that certification was appropriate under Rule 23 because (1) whether Chaparral breached the IDM is a common question, *see* Fed. R. Civ. P. 23(a)(2); and (2) this and other common questions predominate over any individual ones, *see* Fed. R. Civ. P. 23(b)(3).

In response, Chaparral asserted that whether it breached the IDM isn't a common question because a jury won't be able to answer it without first assessing "individualized issues, including the obligation created by each" individual lease "and the gas produced from each" individual well. App. vol. 2, 410. Further, Chaparral asserted, these individual questions about lease language and gas quality, as well as individual questions about damages, predominate over any common questions Naylor Farms might identify. Thus, Chaparral argued, Naylor Farms cannot satisfy Rule 23's certification requirements.

The district court disagreed and concluded that certification was appropriate. As an initial matter, the court ruled that Naylor Farms identified at least one common question: whether Chaparral breached the IDM. The district court then rejected Chaparral's arguments that answering this common question will require an individualized assessment of either the language that appears in each lease or the quality of the gas that comes from each well. Next, the district court ruled that common questions, including whether Chaparral breached the IDM, predominate over any individual ones. Ultimately, after addressing Rule 23's remaining

5

requirements, the district court granted Naylor Farms' motion to certify.[5] Chaparral now appeals the district court's class-certification order.

## Analysis

According to Chaparral, the district court erred in certifying the class under Rule 23. In support, Chaparral advances three discrete arguments. It first asserts the district court erred in failing to recognize that marketability constitutes an individual question—one that necessarily predominates over any common ones in this litigation. It next contends the district court erred in rejecting Chaparral's argument that distinctions in lease language also give rise to individual questions, and that those individual questions likewise predominate. Finally, it insists the district court erred in failing to recognize that in the absence of evidence indicating Chaparral employs a uniform payment methodology, certification is inappropriate. We address each of these arguments in turn.

### I.     Marketability

As discussed above, the cornerstone of Naylor Farms' class-action lawsuit is its allegation that Chaparral breached the IDM by improperly saddling Naylor Farms and other similarly situated royalty owners with certain gas-treatment costs.

The parties agree that the success of this allegation turns in large part on when the gas at issue became marketable. But they disagree about whether, in assessing marketability, a jury will need to individually analyze the quality of gas that each

---

[5] The district court excluded Naylor Farms' fraud claim from the class-certification order.

6

well produced. And by extension, they also disagree about whether the attendant need to conduct such an individualized assessment renders class certification inappropriate.

To resolve the parties' disagreement on this point, we begin with an overview of Oklahoma state law. We then discuss Rule 23's certification requirements. Next, we explain how the district court applied Rule 23 in the context of Naylor Farms' state-law claims. Finally, we set forth the applicable standard of review and discuss whether, considering that deferential standard, Chaparral's marketability arguments require us to reverse the district court's class-certification order.

### A. Oklahoma Law

As discussed in more detail below, the ultimate issue before us in this appeal is whether the district court abused its discretion in concluding that Naylor Farms satisfied Rule 23's certification requirements. *See Vallario v. Vandehey*, 554 F.3d 1259, 1264 (10th Cir. 2009). And this ultimate issue presents a question of federal law. But that doesn't doom Oklahoma law to irrelevancy. On the contrary, at the heart of the parties' Rule 23 dispute lies an intermediate state-law question: When is gas marketable under Oklahoma law? Thus, we begin our discussion with an overview of that law. *Cf. Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (noting that Rule 23 analysis will often "overlap with the merits of the plaintiff's underlying claim"); *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) (explaining that Rule 23 inquiry requires "consideration of how the

7

class intends to answer factual and legal questions to prove its claim" and thus "will frequently entail some discussion of the claim itself").

To the extent we "are called upon to interpret state law" in resolving this appeal, we begin by "look[ing] to the rulings of [Oklahoma's] highest state court." *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007) (quoting *Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002)). It has been more than two decades since the Oklahoma Supreme Court (OSC) has said anything meaningful about marketability. *See Mittelstaedt*, 954 P.2d 1203. And neither party suggests *Mittelstaedt* involved (or even contemplated, for that matter) the type of wellhead sales contracts that Chaparral allegedly utilized here. Thus, in the absence of any guidance from the OSC on the specific marketability questions before us in this appeal, our task is "to predict how [the OSC] would rule" if it were to answer those questions. *Stickley*, 505 F.3d at 1077 (quoting *Johnson*, 305 F.3d at 1118). In undertaking that task, we find certain aspects of *Mittelstaedt* relevant to, albeit not dispositive of, the issues before us.

In *Mittelstaedt*, the OSC began by explaining that the IDM imparts upon lessees like Chaparral a duty "to provide a marketable product available to market." 954 P.2d at 1208. And as the OSC noted, "[i]t is common knowledge that raw or unprocessed gas" must usually undergo one or more GCDTP services to make that gas marketable.[6] *Id.* Thus, because the costs of such GCDTP services are often

---

[6] In *Mittelstaedt*, the OSC discussed "separation, dehydration, compression, and treatment" but didn't mention gathering or transporting. 954 P.2d at 1208.

"associated with" making gas marketable, the OSC explained that the IDM typically precludes a lessee from "deducting a proportionate share" of those costs from royalty payments. *Id.* at 1205. But the OSC then recognized that a lessee may sometimes be able to demonstrate that gas is "in a marketable form at the well[head]." *Id.* at 1208. In that scenario, GCDTP services aren't "necessary" to transform the already-marketable gas into a marketable product. *Id.* at 1208. Yet a lessee may nevertheless opt to perform such services with an eye toward "enhancing" the value of the "already[-]marketable" gas. *Id.* at 1210. And when it does so, the OSC explained, the cost of performing such GCDTP services "may be allocated to the royalty interests" if the lessee can make certain additional showings. *Id.*

We derive two controlling principles from *Mittelstaedt*. First, *Mittelstaedt* resolved that when *unmarketable* gas undergoes GCDTP services for the purpose of transforming that unmarketable gas into a marketable product, the lessee must bear the cost of the GCDTP services. Second, *Mittelstaedt* resolved that when *marketable* gas undergoes GCDTP services to enhance the value of gas that is already marketable, the lessee may, under certain circumstances, allocate the cost of the GCDTP services to royalty holders.

Yet *Mittelstaedt* left unresolved a whole host of other questions. The most obvious are these: What does the term "marketable" mean, and what factors

Nevertheless, because neither party identifies any legally significant distinctions between these services, we continue to use the term "GCDTP services" when discussing *Mittelstaedt*.

9

determine when, where, and if gas became marketable for purposes of applying *Mittelstaedt*'s marketable-product rule?

Notably, the OSC has declined at least two recent invitations to address these questions. *See* Order Denying Certiorari, *Whisenant v. Strat Land Expl. Co.*, No. 115,660 (Okla. Oct. 1, 2018); Order Denying Certiorari, *Pummill v. Hancock Expl. LLC*, No. 114,703 (Okla. May 21, 2018). Further, the OSC declined one of these invitations over the dissenting voices of two of its own members. *See* Dissent from Order Denying Certiorari, *Pummill*, No. 114,703 (May 21, 2018) (Winchester, J.) (noting that OSC "should grant certiorari to refine what constitutes a 'marketable product' as that term is used in [*Mittelstaedt*]").

Nevertheless, the Oklahoma Court of Civil Appeals (OCOCA) has attempted to fill the resulting legal vacuum, albeit with somewhat inconsistent outcomes. *See Whisenant v. Strat Land Expl. Co.*, 429 P.3d 703, 707, 708–10 (Okla. Civ. App. 2018) (recognizing that term "marketable product" isn't susceptible to and has no uniform definition, but then implicitly suggesting marketability always turns, at least in part, on individual characteristics of gas at issue); *Pummill v. Hancock Expl. LLC*, 419 P.3d 1268, 1278 (Oka. Civ. App. 2018) (indicating that in some cases, it may be possible to answer marketability question based on characteristics of relevant market, thus rendering individualized gas-quality assessment unnecessary).

In *Whisenant*, for instance, the OCOCA held that the state trial court erred when, in proceeding under Okla. Stat. Ann. tit. 12, § 2023(B)(3), it certified a class of Oklahoma royalty owners who brought claims similar to those Naylor Farms

10

advances here.[7] *See* 429 P.3d at 706–07. Specifically, those royalty owners alleged that the defendant, who operated several Oklahoma gas wells, breached the IDM by calculating "royalties based on what it received from" a midstream processing company, "rather than based on what" that midstream processing company "received for the gas at the interstate (or intrastate) pipeline inlet." *Id.* at 706.

In reversing the district court's certification order, the *Whisenant* court initially expressed its view that the OSC has, "for good reasons," declined to "define the meaning of 'marketable product,'" opting instead to leave the marketability question "open to resolution on a case-by-case basis." *Whisenant* 429 P.3d at 708 (quoting *Mittelstaedt*, 954 P.2d at 1208). Nevertheless, immediately after suggesting that the concept of marketability isn't susceptible to any uniform definition or test, the *Whisenant* court indicated that the answer to the marketability question will always turn, at least in part, on "the quality of [the] gas" at issue. *Id.* at 710–12. Thus, the *Whisenant* court reasoned, a "highly individualized and fact-intensive review of each [class member's] claim," as informed by the quality of the gas at each individual well, "would be necessary to determine if" the defendant in that case breached the IDM. *Id.* at 707, 709–10 (quoting *Strack v. Cont'l Res., Inc.*, 405 P.3d 131, 140 (Okla. Ct. Civ. App. 2017)).

In *Pummill*, on the other hand, a different panel of the OCOCA indicated that, in some circumstances, it may be possible to determine whether gas is marketable

---

[7] Section 2023(B)(3) is Rule 23(b)(3)'s state-law counterpart. *See Whisenant*, 429 P.3d at 706.

11

without undertaking such a gas-quality assessment. In that case, the state trial court ruled that the gas at issue wasn't marketable "at or near the wellhead" and that instead the gas only became marketable once it "reache[d] the tailgate of" a midstream processing plant—i.e., once the midstream processing company completed certain GCDTP services. *Pummill*, 419 P.3d at 1271, 1276–78.

In reaching that conclusion, the trial court focused not on a qualitative analysis of the gas itself, but on evidence about "the market in which" the defendants (there, the well operator and multiple lessees) "chose[] to participate." *Id.* at 1270–71, 1278. In particular, although the gas at issue was *physically transferred* to the midstream processing company near the wellhead, the trial court concluded that the well operator was "not in the wellhead market." *Id.* at 1271, 1278. Instead, the trial court reasoned, no "*actual sale*" occurred until the gas was "acceptable for transport in" and capable of being "transferred into" high-pressure pipelines. *Id.* at 1278. Thus, the trial court deduced, the well operator was in the high-pressure pipeline market. And because the gas wasn't capable of being sold on the high-pressure pipeline market until it was "compressed, treated, dehydrated, separated, and processed," the trial court ruled the gas wasn't marketable until it underwent those services. *Id.*

The *Pummill* court affirmed. *Id.* at 1280. In doing so, it expressly endorsed the trial court's method of "focus[ing] on" when the gas at issue was first capable of being sold on "the market in which" the well operator "chose[] to participate"—there, the high-pressure pipeline market. *Id.* at 1278. And because the gas at issue wasn't capable of being sold on the high-pressure pipeline market until GCDTP services

12

rendered the gas "acceptable for transport in high-pressure pipelines," the OCOCA agreed the gas wasn't marketable until that point. *Id.* Thus, the OCOCA held, the IDM precluded the defendants from passing on to royalty owners the costs associated with performing those GCTDP services. *Id.* at 1280.

Notably, en route to affirming the trial court's ruling, the OCOCA declined to adopt Kansas's rule that gas is marketable once it is "acceptable to a purchaser in a good[-]faith transaction." *Id.* at 1276 (quoting *Fawcett v. Oil Producers, Inc.*, 352 P.3d 1032, 1034 (Kan. Ct. App. 2015)). And the OCOCA likewise rejected the defendants' related argument that "raw or minimally processed gas" becomes marketable as soon as a "limited group of potential purchasers" is willing to "purchase" that gas "for further processing and sale downstream." *Id.* at 1277; *see also id.* at 1278 (explaining that "[e]vidence of hypothetical sales of raw product to a limited group of potential purchasers to whom such gas would be acceptable[] does not readily lend itself to a conclusion that the product being sold is 'marketable' in a free and competitive market"). Instead, the *Pummill* court reasoned, gas becomes marketable when it's subject to an "*actual sale*." *Id.* at 1278 (explaining that this conclusion is "consistent with" OSC precedent describing "market value" of gas "as being based on what [gas] will sell for, between a willing buyer and seller, in 'a free and open market'" (quoting *Howell v. Texaco Inc.*, 112 P.3d 1154, 1159 (Okla. 2004))).

The OCOCA's 2018 decisions in *Pummill* and *Whisenant* illustrate what has long been clear: although "it is easy to articulate [*Mittelstaedt*'s] marketable-product

rule, application of it to a particular circumstance is difficult." *Foster v. Apache Corp.*, 285 F.R.D. 632, 638 & n.14 (W.D. Okla. 2012). And for reasons we turn to next, "[d]oing so in the class action context"—as the district court was required to do here—is more difficult still. *Id.* at 638.

## B. Rule 23's Certification Requirements

Rule 23 sets forth the requirements for class certification.[8] *See Wal–Mart Stores, Inc.*, 564 U.S. at 345. Only two of those requirements are at issue here: Rule 23(a)(2)'s commonality requirement and Rule 23(b)(3)'s predominance requirement.[9] A plaintiff seeking class certification satisfies Rule 23(a)(2)'s commonality requirement by demonstrating that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A plaintiff satisfies Rule 23(b)(3)'s related predominance requirement by showing that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

---

[8] Rule 23's requirements inform our analysis of each of the three discrete arguments Chaparral presents on appeal. *See infra* Sections II, III.

[9] Chaparral asserts that "Rule 23 includes an 'implied requirement of ascertainability'" and that Naylor Farms cannot satisfy this "implied requirement" here. Aplt. Br. 14 (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)). But Chaparral fails to "cite the precise references in the record where" this ascertainability argument "was raised and ruled on" below. 10th Cir. Rule 28.1(A). And it also fails to make a case for plain error on appeal. Accordingly, we decline to address this argument. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011); *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1540 n.3 (10th Cir. 1996). Likewise, although Chaparral makes passing reference to Rule 23(a)(3)'s typicality requirement, *see* Aplt. Br. 23, 33, we find these "stray sentences" insufficient to adequately brief any argument on this point. *Eizember v. Trammell*, 803 F.3d 1129, 1141 (10th Cir. 2015).

Rule 23(a)(2)'s commonality requirement "is easy to misread." *Wal–Mart Stores, Inc.*, 564 U.S. at 349. It requires a plaintiff to do more than merely identify "a common contention"; instead, that "common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. In other words, the focus of Rule 23(a)(2)'s commonality requirement is not so much on whether there exist common *questions*, but rather on "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

Rule 23(b)(3)'s predominance requirement is related to, albeit "more demanding than," Rule 23(a)(2)'s commonality requirement. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). To satisfy Rule 23(b)(3), a plaintiff must "show that common questions subject to generalized, classwide proof *predominate* over individual questions." *CGC Holding Co.*, 773 F.3d at 1087; *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class[]wide proof.'" (alteration in original) (quoting 2 William B. Rubenstein et al., *Newberg on Class Actions* § 4:50 (5th ed. 2012))).

15

Notably, this doesn't mean a plaintiff must show "that all of the elements of the claim entail questions of fact and law that are common to the class" or "that the answers to those common questions [are] dispositive" of the claim. *CGC Holding Co.*, 773 F.3d at 1087. Instead, the predominance inquiry "asks whether the common, aggregation-enabling[] issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.* (quoting *Newberg on Class Actions* § 4:49). Thus, to determine whether a plaintiff can satisfy Rule 23(b)(3)'s predominance requirement, a court must first "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate." *Id.* (quoting *Newberg on Class Actions* § 4:50). Critically, so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)—even if there remain individual issues, such as damages, that must be tried separately. *Tyson Foods, Inc.*, 136 S. Ct. at 1045.

Having reviewed the relevant Rule 23 requirements and examined Oklahoma's treatment of the marketability question, we next explain how the district court treated the interplay between the former and the latter in ruling on Naylor Farms' motion to certify.

## C. The District Court's Ruling

The district court found that Naylor Farms successfully identified at least one common question: whether Chaparral breached the IDM.[10] And the court then ruled

---

[10] Chaparral contends the district court erred in concluding that the threshold issue of whether each lease contains an IDM is "in and of itself" a common question.

16

that this common question predominates over any individual ones.

Critically, in doing so, the district court first narrowed the class to include only those royalty owners whose leases contain clauses that are similar to the royalty clauses (collectively, *Mittelstaedt* Clauses) the OSC considered in three cases: (1) *Mittelstaedt*, (2) *TXO Production Corp. v. State ex rel. Commissioners of Land Office*, 903 P.2d 259 (Okla. 1995), and (3) *Wood v. TXO Production Corp.*, 854 P.2d 880 (Okla. 1993). Because the OSC has held that the language of these *Mittelstaedt* Clauses "does not negate the IDM" and "is consistent with the marketable[-]product rule," the district court reasoned that—contrary to Chaparral's arguments—any remaining "variations in lease language" do not defeat commonality or predominance. App. vol. 5, 1148, 1153.

Next, the district court rejected Chaparral's argument that in order to determine whether Chaparral breached the IDM, a jury will have to engage in an

---

Aplt. Br. 11. As an initial matter, we disagree with the premise of this argument; at most, it appears the district court treated the existence of the IDM "*and* its alleged breach" as a compound common question. App. vol. 5, 1154 (emphasis added).

In any event, even assuming the district court treated the existence of the IDM as a standalone common question and even assuming it erred in doing so, the error was harmless; the district court correctly concluded that *whether Chaparral breached the IDM* is a common question. *See Wal–Mart Stores, Inc.*, 564 U.S. at 350 (explaining that question is common for purposes of Rule 23(a)(2) if its answer "will resolve an issue that is central to the validity of each one of the claims in one stroke"); *cf. Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 916–17 (10th Cir.) (holding that question of whether defendant's policy violated federal statute constituted common question), *cert. denied*, 139 S. Ct. 143 (2018). Chaparral doesn't seriously argue otherwise. And when it comes to satisfying Rule 23(a)(2)'s commonality requirement, the existence of this single common question "will do." *Wal–Mart Stores, Inc.*, 564 U.S. at 359.

individualized "well-by-well analysis" to determine when the gas from each well became marketable. *Id.* at 1149. In rejecting this argument, the district court acknowledged that gas quality might vary from well to well and that, as a result, some gas might require more or different GCTDP services to become marketable than other gas. But the district court explained that in order to determine whether Chaparral breached the IDM, an individualized gas-quality analysis is nevertheless "unnecessary" in this case because, as Naylor Farms demonstrated, all the gas at issue "require[d]" *at least one* GCDTP service "to become marketable." *Id.* at 1149, 1151, 1157.

Thus, the district court appeared to recognize, differences in the precise number and nature of GCDTP services required to make the gas from each well marketable are relevant only to the post-breach question of damages. And because Naylor Farms "provided evidence that [its] expert can determine damages on a class[]wide basis through use of a model," the district court ruled these distinctions don't defeat predominance. *Id.* at 1155. Alternatively, the district court pointed out that if necessary, it can divide the class into subclasses at a later date for purposes of determining damages. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."), (c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). Accordingly, the district granted Naylor Farms' motion to certify.

18

**D.     Our Standard of Review**

Our review of the district court's decision is highly deferential. So long as the district court "applied the proper standard in deciding whether to certify [the] class, we may reverse that decision only for abuse of discretion." *CGC Holding Co.*, 773 F.3d at 1085 (quoting *Adamson v. Bowen*, 855 F.2d 668, 675 (10th Cir. 1988)); *see also Vallario*, 554 F.3d at 1264 ("Because class certification decisions are necessarily case specific, district courts possess significant latitude in deciding whether or not to certify a class." (citation omitted)). A "district court abuses its discretion when it misapplies the Rule 23 factors—either through a clearly erroneous finding of fact or an erroneous conclusion of law—in deciding whether class certification is appropriate." *CGC Holding Co.*, 773 F.3d at 1085–86.

Here, Chaparral doesn't argue that the district court failed to apply the proper Rule 23 standard. Thus, in addressing those arguments Chaparral does make, we must defer to the district court's ruling unless Chaparral shows the district court's certification decision falls outside "the bounds of rationally available choices given the facts and law involved in the matter at hand." *Id.* at 1086 (quoting *Vallario*, 554 F.3d at 1264). For the reasons discussed below, we conclude that Chaparral fails to make this demanding showing.

**E.     Chaparral's Marketability Arguments**

Chaparral's primary argument on appeal is that the district court abused its discretion in ruling that Naylor Farms demonstrated commonality and predominance because such a ruling is irreconcilable with Oklahoma's approach to determining

19

marketability. Or, as Chaparral puts it, "Certifying a class of '*Mittelstaedt* Clause [l]eases' is contrary to *Mittelstaedt*." Aplt. Br. 16.

Recall that, under *Mittelstaedt*, two things are clear. First, when *unmarketable* gas undergoes GCDTP services for purposes of *transforming* the unmarketable gas into a marketable product, a lessee breaches the IDM by passing on to royalty owners the cost of performing those GCDTP services. *See Mittelstaedt*, 954 P.2d at 1205. Second, when *marketable* gas undergoes GCDTP services to *enhance* the value of gas that is already marketable, a lessee may, under certain circumstance, allocate the cost of those services to royalty owners without breaching the IDM. *Id*. at 1210. Thus, to determine whether Chaparral breached the IDM—i.e., to answer the question the district court determined was common to the class for purposes of satisfying Rule 23(a)(2)'s commonality requirement—a jury will have to determine when the gas at issue became marketable.

Here, as Chaparral points out, the district court ruled that (1) the question of when the gas became marketable can be answered via generalized, classwide proof and (2) as a result, the marketability question doesn't defeat predominance. *See* Fed. R. Civ. P. 23(b)(3) (allowing for certification if common questions predominate over individual ones); *Tyson Foods, Inc.*, 136 S. Ct. at 1045 ("An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is

20

susceptible to generalized, class[]wide proof.'" (first alteration in original) (quoting *Newberg on Class Actions* § 4:50)).

But according to Chaparral, the district court's ruling on this point rests on a flawed assumption. Specifically, Chaparral contends that in ruling a jury can answer the marketability question without undertaking a well-by-well analysis, the district court relied on the fact that all the gas at issue actually underwent GCDTP services. And in so ruling, Chaparral argues, the district court made a legally erroneous assumption: it incorrectly assumed that any time gas undergoes GCDTP services, this proves, ipso facto, that the gas wasn't marketable before it underwent those services.

We agree with Chaparral that *if* the district court assumed GCDTP services function solely as a mechanism for transforming unmarketable gas into a marketable product, then the court committed a legal error. As Chaparral correctly points out, *Mittelstaedt* expressly recognizes that sometimes even *marketable* gas undergoes GCDTP services—not to "create a marketable product" but to "transform[] an already[-]marketable product into an enhanced" one. *Mittelstaedt*, 954 P.2d at 1209–10; *see also id.* at 1208 (acknowledging that it's possible for gas to "be in a marketable form at the well[head]," i.e., before any GCDTP services are performed).[11] But we disagree with Chaparral that the district court ever assumed otherwise.

---

[11] In asserting that gas *can* be marketable at the wellhead, Chaparral appears to rely in part on its position that the gas at issue here was *in fact* marketable at the wellhead—because (according to Chaparral) that is where Chaparral first "sold" the

That is, contrary to Chaparral's argument, the district court neither ruled nor assumed "that gas must be *unmarketable* if it goes through a processing plant or receives one or more of the GCDTP services." Aplt. Br. 19. On the contrary, the district court expressly recognized that the marketability question turns not on *whether* the gas undergoes GCDTP services, but on whether the gas undergoes GCDTP services "*to become marketable*." App. vol. 5, 1151. Indeed, the district court expressly relied on evidence indicating that all the gas at issue here "require[d] GCDTP services *to be made marketable*" in order to distinguish the facts of this case from those before this court in *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213 (10th Cir. 2013); in that case, the district court pointed out, some of the gas at issue "may [have been] marketable *at the well*." App. vol. 5, 1146 (emphases added) (quoting *Roderick*, 725 F.3d at 1217). Critically, in making this distinction, the district court necessarily acknowledged both that (1) "gas may be marketable at the well[head]" and (2) the performance of GCDTP services does not prove, ipso facto, that the gas at issue was *not* marketable before those services were

---

gas "to a [midstream processing company] in a good[-]faith transaction." Aplt. Br. 20; *see also id.* at 18 ("Gas is in marketable condition once it can be marketed.").

As an initial matter, we question whether the OSC would adopt this good-faith-transaction test for marketability. *See Pummill*, 419 P.3d at 1278–79 (suggesting good-faith-transaction approach is inconsistent with controlling OSC authority). More importantly, as the district court noted below, accepting as true Chaparral's blanket assertion that *all* the gas at issue was marketable at the wellhead because that is where Chaparral could first "market[]" it to midstream processing companies, Aplt. Br. 18, would serve only to "demonstrate[]" commonality, not "negate[]" it, App. vol. 5, 1149; such a blanket rule would obviate the need for any individualized analysis of the gas from each well.

22

performed. *Id.* (quoting *Roderick*, 725 F.3d at 1217). Accordingly, we reject Chaparral's assertion that the district court assumed otherwise.

Alternatively, Chaparral argues that the district court erred in treating marketability as a question of law. Instead, Chaparral asserts, marketability is a question of fact—one that turns, at least in part, on "gas quality." Aplt. Br. 23. And it further insists that because the quality of its gas varies from well to well, a jury will be unable to resolve the marketability question (and, by extension, the question of whether Chaparral breached the IDM) without performing a well-by-well analysis to determine whether any of the gas at issue was marketable at the wellhead. Thus, Chaparral insists, the district court abused its discretion in failing to recognize that marketability defeats commonality and predominance.

In evaluating this argument, we need not resolve whether the district court treated marketability as a question of law or a question of fact. Nor must we resolve whether, if the district court indeed treated marketability as a question of law, it erred in doing so.[12] Even assuming Chaparral is correct on both points, that doesn't necessarily mean Chaparral is entitled to reversal. On the contrary, "we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court." *Richison*, 634 F.3d at 1130. That is, we have a "preference for affirmance"—one that "follows from the deference we owe to the

---

[12] We nevertheless note in passing that it appears Oklahoma indeed treats marketability as question of fact. *See, e.g.*, *Whisenant*, 429 P.3d at 708 n.6; *Pummill*, 419 P.3d at 1274 n.9.

23

district courts and the judgments they reach, many times only after years of involved and expensive proceedings." *Id.* And "[b]ecause of the cost and risk involved anytime we upset a court's reasoned judgment, we are ready to affirm whenever the record allows it." *Id.* Thus, to demonstrate it is entitled to reversal, Chaparral must "shoulder a heavy burden": it "must come ready *both* to show" that the district court erred and "to explain why no other grounds" will allow us to affirm the district court's decision. *Id.* For the reasons discussed below, we conclude that in light of the OCOCA's persuasive reasoning in *Pummill*, Chaparral cannot shoulder the second part of this heavy burden here. *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) (explaining that decision of intermediate state appellate court "is a datum for ascertaining state law [that] is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise").

In *Pummill*, the OCOCA relied heavily on two factors in affirming the state trial court's ruling that the gas at issue wasn't marketable before it underwent GCTDP services. As an initial matter, the OCOCA pointed out that the first "*actual sale*" of the gas occurred not when the defendants transferred the gas to a midstream processing company, but instead "at the 'tailgate' of the [processing] plants, where [the gas was] transferred into high-pressure lines." 419 P.3d at 1277–78. And the OCOCA deduced from the location of this first "*actual sale*" that "the market in which" the defendants "chose[] to participate" was the pipeline market, not the wellhead market. *Id.* Second, the OCOCA noted that the gas had to undergo GCDTP

24

services to make it "acceptable for delivery" into the high-pressure pipelines. *Id.* at 1277. Accordingly, the OCOCA concluded that the IDM precluded the defendants from "deduct[ing] from [the plaintiffs'] royalties the proportionate expenses associated with preparing the gas for sale" *to such pipelines*. *Id.* at 1280.

Here, Naylor Farms has presented evidence of these same two factors. More importantly, it has presented *classwide* evidence of these same two factors. *See Tyson Foods, Inc.*, 136 S. Ct. at 1045 (explaining that for purposes of Rule 23(b)(3), "a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class[]wide proof'" (alteration in original) (quoting *Newberg on Class Actions* § 4:50)). First, the record contains classwide evidence indicating that Chaparral, like the defendants in *Pummill*, elects to participate in the high-pressure-pipeline market: according to Naylor Farms' expert, this is where Chaparral's gas is actually "sold." Aplt. Supp. App. vol. 18, 5270; *see also Pummill*, 419 P.3d at 1278 (noting that pipeline market was where first "*actual sale*" of gas occurred). Second, Naylor Farms' expert opined that, as a classwide matter, the gas at issue here—like the gas at issue in *Pummill*—was required to undergo at least one GCDTP service before it could "reach" and be "sold into" the pipeline market.[13] Aplt. Supp. App. vol. 18, 5270–71; *see also Pummill*, 419 P.3d at 1277 (concluding that gas wasn't marketable on pipeline market

---

[13] Notably, despite Chaparral's insistence that a well-by-well analysis is necessary to determine when the gas became marketable, Chaparral fails to point to any evidence in the record indicating that such an individualized analysis would yield a different conclusion.

until it was "acceptable for delivery" into relevant pipelines); *cf. Wood*, 854 P.2d at 882 (explaining that IDM imposes "a duty to get the product *to the place of sale* in marketable form" (emphasis added)).

In short, the district court's ruling that marketability is subject to classwide proof under the specific facts of this case is entirely consistent with the OCOCA's decision in *Pummill*. Thus, Chaparral faces an uphill climb in attempting to show that this particular ruling rests on an error of state law. *See West*, 311 U.S. at 237. In attempting to make that showing here, Chaparral relies heavily on the OCOCA's recent decision in *Whisenant*.

In *Whisenant*, the OCOCA held that the state trial court erred in certifying a class of Oklahoma royalty owners under Oklahoma's analog to Rule 23, reasoning that a "highly individualized and fact-intensive review of each [class member's] claim," as informed by the quality of gas at each individual well, "would be necessary to determine if" the defendant in that case breached the IDM. 429 P.3d at 707–10 (quoting *Strack*, 405 P.3d at 140)). Citing *Whisenant*, Chaparral insists that under Oklahoma law, marketability can *never* be susceptible to classwide proof because it will always require an individualized assessment of the gas produced by each well. And to the extent the district court failed to recognize as much here, Chaparral contends, the court made a legal error and thereby abused its discretion. *See CGC Holding Co.*, 773 F.3d at 1085–86 ("The district court abuses its discretion when it misapplies the Rule 23 factors—either through a clearly erroneous finding of

26

fact or an erroneous conclusion of law—in deciding whether class certification is appropriate.").

In light of *Whisenant*'s similar procedural posture, Chaparral's argument isn't without appeal. But because that argument overlooks a critical aspect of *Whisenant*'s analysis, we ultimately reject it. That is, the *Whisenant* court did hold that, *in that particular case*, "determinations of the quality of gas and other facts pertinent to each well" weren't "susceptible to generalized proof." 429 P.3d at 710. But the *Whisenant* court also expressly eschewed the type of rigid, one-size-fits-all approach to marketability that Chaparral asks us to endorse here. Specifically, the *Whisenant* court recognized that the OSC has declined to adopt a uniform test for determining when gas becomes marketable, and that the OSC has instead "left the issue open to resolution on a case-by-case basis." 429 P.3d at 708. And in recognizing as much, the *Whisenant* court necessarily "left . . . open" the possibility that, *in some cases*, a factfinder may be able to determine when gas became marketable without undertaking an individualized inquiry into the quality of that gas. *Id.*

Critically, the facts in *Pummill* (and, by extension, the facts in this case) fit comfortably in the space "left . . . open" by *Whisenant*. *Id.* Thus, despite any tension that might exist between *Pummill* and *Whisenant*, we rely on both—and "disregard[]" neither—in predicting how the OSC would answer the marketability question before us in this appeal. *West*, 311 U.S. at 237. And in light of *Pummill* and *Whisenant*, we predict the OSC would answer that question by holding that, under the facts of this case, a jury could determine when the gas at issue became marketable without

27

individually assessing the quality of that gas; instead, a jury could make this determination based solely on expert testimony that all the gas at issue was required to undergo at least one GCDTP service before it could "reach" and be "sold into" the pipeline market. Aplt. Supp. App. vol. 18, 5270–71. *See Whisenant*, 429 P.3d at 708 (opining that OSC has intentionally and wisely "left the issue [of marketability] open to resolution on a case-by-case basis"); *Pummill*, 419 P.3d at 1273, 1278 (indicating that in some cases, it may be possible to answer marketability question based on characteristics of relevant market, thus rendering individualized gas-quality assessment unnecessary). Accordingly, the district court didn't abuse its discretion by concluding that the marketability question *in this particular case* is subject to common, classwide proof for purposes of satisfying Rule 23's commonality and predominance requirements. *See Tyson Foods, Inc.*, 136 S. Ct. at 1045; *CGC Holding Co.*, 773 F.3d at 1086; *Richison*, 634 F.3d at 1130.

## II. Lease Language

Next, Chaparral asserts that even if gas-quality variations don't pose a bar to certification, lease-language variations do. Specifically, Chaparral asserts that "[a]t trial, every one of the contracts will have to be considered individually, defeating commonality and predominance." Aplt. Br. 27–28. But the district court concluded otherwise, ruling that its decision to limit the class to leases containing a *Mittelstaedt* Clause renders such an individualized analysis unnecessary.[14]

_____

[14] Naylor Farms asserts we should take judicial notice of certain briefing in *Mittelstaedt* because, according to Naylor Farms, that briefing sheds additional light

In challenging this conclusion, Chaparral first asserts the district court abdicated its duty to determine which leases actually contain a *Mittelstaedt* Clause and instead merely "satisfied itself with [Naylor Farms'] contentions" that this is so. *Id.* at 28. We disagree. As the district court noted, Naylor Farms prepared a chart that "categorized" the leases at issue "by royalty[-]clause language." App. vol. 5, 1143. And we have previously indicated that this is precisely what a plaintiff should do to establish commonality under these circumstances. *See Roderick*, 725 F.3d at 1219.

Like Naylor Farms, the plaintiffs in *Roderick* asserted that each class member's lease contained an IDM. *Id.* at 1218. But neither the plaintiffs nor the district court bothered to examine all the leases to verify this assertion. *Id.* at 1219. Thus, this court recommended that on remand, the plaintiffs should consider "creat[ing] a chart classifying lease types." *Id.* And if they did so, this court opined, "the district court could" rely on that chart to "decide that no lease type negates the IDM." *Id.*

Here, Naylor Farms created such a chart. And contrary to Chaparral's assertions, the district court independently "confirmed that" the chart was "generally accurate." App. vol. 5, 1147. Notably, Chaparral doesn't provide us with any information that might call into question the district court's assessment of the chart's accuracy. Instead, Chaparral merely asserts that because there exist distinctions

on the lease language at issue in *Mittelstaedt* as well as the arguments the parties made about that language. Because we conclude we may resolve Chaparral's lease-language arguments without this additional information, we deny Naylor Farms' motion to take judicial notice.

between the facts in this case and the facts in *TXO*, 903 P.2d 259, and *Wood*, 854 P.2d 880—each of which involved a *Mittelstaedt* Clause—"the district court could not" rely on these two cases to "determine as a matter of law whether" Chaparral could "share[]" certain costs with royalty owners. Aplt. Br. 28–29. In particular, Chaparral asserts that although the costs in *TXO* and *Wood* were incurred on the leased premises, "[t]he costs here were incurred off-lease." *Id.* at 28.

Perhaps these "facts" will ultimately be relevant to the merits question of whether Chaparral *breached* the IDM. *Id.* Perhaps not. Either way, we fail to see how they might be relevant to the question of whether, as a threshold matter, the class leases *contain* an IDM. And the chart was designed to aid the district court in answering the latter question, not the former one. *See Roderick*, 725 F.3d at 1218 (noting that chart could aid district court in determining whether "every class member's lease" contained IDM and, by extension, could help district court determine whether plaintiff satisfied Rule 23(a)(2)'s commonality requirement).

Here, Chaparral offers no further explanation regarding the relevance of these "facts" vis-à-vis the district court's Rule 23 inquiry. Aplt. Br. 28; *see also Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."). Further, Chaparral's position that all "[t]he costs here were incurred off-lease" would tend to support the district court's rulings on predominance and

commonality, not undermine them. *Id.* at 28; *see also Tyson Foods, Inc.*, 136 S. Ct. at 1045; *Wal–Mart Stores, Inc.*, 564 U.S. at 350. Accordingly, we decline to hold that the district court abused its discretion by relying on Naylor Farms' chart after "confirm[ing] that" the chart was "generally accurate." App. vol. 5, 1147.

Chaparral's remaining arguments about lease language rest on its assertions that (1) the leases at issue contain multiple royalty provisions and (2) the interplay between these royalty provisions renders the leases ambiguous. According to Chaparral, this ambiguity would entitle Chaparral to present individualized extrinsic evidence of "the intent of the parties and the meaning of the leases" at trial, including "exhibits [and] interlineations" to each individual lease, as well as evidence about industry customs in effect "when the various leases were executed." Aplt. Br. 33–36.

But as Naylor Farms points out, Chaparral didn't advance this specific extrinsic-evidence argument below as a basis for denying Naylor Farms' motion to certify the class. Instead, Chaparral merely asserted that, as a general matter, "differences in royalty obligations" and lease language defeat commonality and predominance.[15] App. vol. 2, 411. Critically, our "rule against considering new arguments on appeal applies equally when 'a litigant changes to a new theory on appeal that falls under the same general category as an argument presented at trial.'"

---

[15] In its reply brief, Chaparral asserts for the first time that it raised an extrinsic-evidence argument in its response to Naylor Farms' motion for summary judgment. We agree that Chaparral's response to Naylor Farms' summary-judgment motion refers to what might be classified as extrinsic evidence. But we see no argument there that the need to examine such evidence *precludes certification*. Nor do we see any indication that the district court ever ruled on such an argument.

31

*United States v. Nelson*, 868 F.3d 885, 891 n.4 (10th Cir. 2017) (quoting *Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 722 (10th Cir. 1993)). Further, Chaparral fails to argue for plain error on appeal. Accordingly, it has waived its extrinsic-evidence argument. *See Richison*, 634 F.3d at 1131.

Alternatively, even assuming Chaparral preserved its extrinsic-evidence argument below, it fails to adequately brief this argument on appeal. This is so because Chaparral fails to identify any *specific* extrinsic evidence—in the form of an exhibit, interlineation, or industry custom—that might allow a jury to conclude that Chaparral breached the IDM as to one lease but not another. *See* Fed. R. App. P. 28(a)(8)(A) (requiring argument section of appellant's brief to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (explaining that we routinely decline to consider inadequately briefed arguments). Accordingly, even assuming the district court erred, we see no basis upon which to conclude the district court's error prejudiced Chaparral. *See Shinseki v. Sanders*, 556 U.S. 396, 410 (2009) (explaining that "the party seeking reversal normally must explain why the erroneous ruling caused harm"). Thus, we decline to reverse on this basis. And for the same reasons, we likewise decline to reverse based on Chaparral's assertion that even in the absence of any ambiguity in the leases, a jury will be required to consider industry customs in effect "when the various leases were executed" to determine whether Chaparral breached the terms of

32

each individual lease. Aplt. Br. 36. Again, Chaparral neither identifies any particular customs nor explains their legal relevance.

In its final lease-language argument, Chaparral asserts that individual variations in its *agreements with midstream processing companies*, rather than in its agreements with Naylor Farms and other royalty owners, defeat commonality and predominance. In support, Chaparral says Naylor Farms' underlying legal theory is that Chaparral committed fraud by using wellhead sales contracts to circumvent Oklahoma law. And to evaluate this theory, Chaparral contends, a jury will have to conduct an individualized inquiry to determine whether Chaparral entered into each of those wellhead sales contracts in good faith.

But this argument overlooks the fact that the district court declined to certify Naylor Farms' fraud claim. And Chaparral cites no authority indicating that whether it entered into the wellhead sales contracts in good faith is dispositive of, or even relevant to, the claims the district court did certify. Accordingly, we find this argument inadequately briefed and decline to consider it as well. *See* Fed. R. App. P. 28(a)(8)(A); *Bronson*, 500 F.3d at 1104. And we further conclude that Chaparral therefore fails to demonstrate the district court abused its discretion in certifying the class despite minor variations in lease language.

## III. Uniform Payment Methodology

As a final matter, Chaparral asserts Naylor Farms failed to demonstrate that Chaparral uses a uniform payment methodology to calculate royalty payments and

33

that this "lack of a common payment methodology defeats class certification." Aplt. Br. 39.

We have indeed explained that the existence of a uniform payment methodology, standing alone, isn't *sufficient* to establish predominance. *See Roderick*, 725 F.3d at 1220. But contrary to Chaparral's assertion, we see nothing in *Roderick* that indicates the existence of such a methodology is *necessary* to accomplish this task. Accordingly, we reject this argument. And to the extent Chaparral instead means to suggest that individual questions about damages defeat predominance, we do not agree. "The fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification." *Menocal*, 882 F.3d at 922 (quoting *Roderick*, 725 F.3d at 1220)). Instead, "material differences in damages determinations" will only destroy predominance if those "individualized issues will overwhelm . . . questions common to the class." *Roderick*, 725 F.3d at 1220.

We see no indication that will occur here. On the contrary, as the district court pointed out, Naylor Farms "provided evidence that [its] expert can determine damages on a class[]wide basis through use of a model," thus obviating the need for individualized evidence. App. vol. 5, 1155; *see also Tyson Foods, Inc.*, 136 S. Ct. at 1045. And Chaparral fails to explain why that model is inaccurate or unworkable. Further, the district court correctly noted that if necessary, it can later divide the class into subclasses for purposes of determining damages. *See* Fed. R. Civ. P. 23(c)(1)(C), (c)(5); *Roderick*, 725 F.3d 1213. Thus, the district court didn't abuse its discretion in

ruling that individual questions about damages don't defeat predominance. *See Roderick*, 725 F.3d 1213 ("[T]he district court is in the best position to evaluate the practical difficulties which inhere in the class action format, and is especially suited to tailor the proceedings accordingly.").

## Conclusion

For the reasons discussed above, we conclude that Chaparral fails to demonstrate the district court's decision to certify the class falls outside "the bounds of rationally available choices given the facts and law involved in the matter at hand." *CGC Holding Co.*, 773 F.3d at 1086 (quoting *Vallario*, 554 F.3d at 1264). We therefore affirm the district court's order.